# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| JASON TILLERY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:23-cv-00203 |
| | ) | |
| CORECIVIC, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION</u>

Fellow inmates at Whiteville Correctional Facility ("WCF"), operated by CoreCivic, Inc. and CoreCivic of Tennessee, LLC ("CoreCivic"), assaulted Jason Tillery not once, but twice while no guard was present. After the first assault, WCF sent Tillery to a hospital for treatment. The doctor diagnosed him with facial fractures and ordered a follow-up at an outside eye clinic. WCF brought Tillery back and put him in Dr. Elaina Rodela's care. Though she saw and presumably treated Tillery, she never sent him for the ordered follow-up. Despite the first attack, WCF eventually placed Tillery back in general population. Tillery was again assaulted when no guard was present.

Tillery now brings several claims. He asserts that warden Vince Vantell violated his civil rights through indifference to his safety and that Vantell, Rodela, and her staff violated his civil rights through indifference to his medical needs. At a corporate level, he claims that CoreCivic and its officers—CEO Damon Hininger, COO Patrick Swindle, and VP of facility operations Jason Medlin—knowingly acquiesced in his harm by systematically understaffing facilities to turn a profit. Defendants move to dismiss those claims, as well as the state negligence and malpractice claims. (Doc. No. 43). The threshold question is whether Tillery states a federal claim under the

Eighth Amendment's two-part deliberate-indifference framework. He does, but only as to Rodela's alleged indifference to his medical needs. The remaining federal claims fail. The motion will thus be granted in part and denied in part.

## I.    FACTUAL ALLEGATIONS[1]

On March 6, 2022, WCF left Tillery's unit unguarded. (Doc. No. 38 ¶ 11). Because no one guarded the unit, an inmate was able to enter Tillery's cell. (Id.). The inmate then assaulted Tillery with a fan motor. (Id.).

WCF sent Tillery to Elvis Presley Trauma Center in Memphis. (Id. ¶ 12). Physicians found multiple fractures in his face and performed surgery on them. (Id.). They directed Tillery to visit an eye clinic within two weeks of his discharge. (Id.)

When Tillery returned to WCF, the facility placed him in disciplinary segregation rather than the medical unit. (Id. ¶ 13). WCF assigned Dr. Elaina Rodela to take care of him. (Id. ¶ 14). Rodela oversaw "T. Robinson," a nurse practitioner who periodically checked in on Tillery, but "was not qualified to provide follow-up care." (Id. ¶¶ 13-14). Tillery repeatedly complained about headaches and blurred vision to Robinson, but neither Robinson nor Rodela sent him for his eye clinic follow-up. (Id.).

Despite Tillery's injuries, WCF placed him back in general population less than ten days after the attack. (Id. ¶ 15). Inmates immediately "threatened and extorted" him. (Id.). Sometime the next month, another inmate assaulted Tillery in the face when no guards were present. (Id. ¶ 16). The second assault aggravated his preexisting injuries. (Id.). Around that same time, another inmate also attempted to rape Tillery. (Id.). The unit was guarded when that incident

---

[1] Unless noted otherwise, the Court draws the facts from the operative Complaint (Doc. No. 38) and accepts them as true to rule on the motion. See Erickson v. Pardus, 551 U.S. 89, 94 (2007).

occurred, but the guard "was merely annoyed that she had [to] complete paperwork about the rape." (Id.).

Before Tillery left WCF later that year, "[m]edical staff" did not provide him with "his prescribed pain medication," and "he suffered continuously until his release." (Id. ¶ 17). Tillery filed grievances about his lack of medical care, but Rodela and Vantell ignored them. (Id.). Tillery suffers from blurred vision, headaches, and PTSD, none of which WCF treated. (Id.).

Tillery references numerous audits, media reports, and litigation involving understaffing and inmate danger at other CoreCivic facilities in Idaho, Oklahoma, Kansas, Mississippi, and Tennessee from 2011 to 2022. (Id. ¶¶ 18-30). From that information, Tillery alleges that CoreCivic has "adopted a policy of withholding medical care from inmates in order to maximize profits" that contributed to his suffering. (Id. ¶ 31). He also alleges that CoreCivic's officers—Hininger, Swindle, and Medlin—"knew about persistently inadequate medical care," withheld "medical care in order to maximize profits," and "continued to understaff prisons (including WCF) in order to maximize profits." (Id. ¶ 32).

## II.  LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Venema v. West, 133 F.4th 625, 632 (6th Cir. 2025) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (quoting Iqbal, 556 U.S. at 678). When determining whether the complaint meets this standard, the Court must accept the complaint's factual allegations as true, draw all reasonable inferences in the plaintiff's favor, and "take all of those facts and inferences and determine whether they plausibly give rise to an entitlement to relief." Doe v. Baum, 903 F.3d 575, 581 (6th Cir. 2018).

3

## III.    ANALYSIS

Tillery brings his federal claims under 42 U.S.C. § 1983 against all Defendants in one single, undifferentiated count. (Doc. No. 38 ¶ 34). He alleges violation of his Eighth Amendment rights through deliberate indifference to his safety (failure to protect) and/or his health (medical indifference). (Id.). But Tillery does not specify which Defendants he sues for failure to protect, which he sues for medical indifference, or which he sues for both. (Id.).

Though the Complaint is undifferentiated, the parties' briefing sheds light on which claims Tillery is pursuing and against whom he is pursuing them. On the failure-to-protect claim, Tillery only argues liability as to Vantell and CoreCivic. (Doc. No. 47 at 3). On the medical-indifference claim, Tillery only argues liability as to Rodela, "T. Robinson" (who Tillery never served and is not properly before the Court), and Vantell. (Id. at 5). As to the corporate officers, Tillery does not directly assert either theory against them. Instead, he argues that they are liable for "civil rights violations" based on their "knowing acquiesc[ence]" in the unconstitutional conduct of their subordinates, citing supervisory liability cases. (Id. at 5-6). And finally, Tillery argues that CoreCivic is liable under Monell. (Id. at 7-8).

Tillery also does not specify whether he is suing the individual Defendants in their individual capacities, official capacities, or both. Defendants argue in their opening brief that, to the extent Tillery asserts official-capacity claims, they should be dismissed. (Doc. No. 44 at 25-26). Tillery neither responded to that argument nor clarified whether he is bringing official-capacity claims. (See Doc. No. 47). The Court could construe Tillery's silence as a waiver. But this Court has construed ambiguous complaints in similar cases as asserting claims both individually and officially. See, e.g., Est. of Leeper v. CoreCivic, Inc., 797 F. Supp. 3d 797, 806 (M.D. Tenn. 2025). The Court will do so again here, but only as to the claims against Vantell and Rodela. The Court declines to construe the claims against the corporate officers as individual-

capacity claims because there are no allegations that they have any personal involvement in, or knowledge of, the facts that led to Tillery's injuries. See Massey v. CoreCivic, Inc., 2023 WL 5917399, at *7 (M.D. Tenn. Sept. 11, 2023), aff'd, 2024 WL 3086518 (6th Cir. June 21, 2024) (construing similar claims against CoreCivic officers as only official-capacity claims). The Court will construe those claims as only official-capacity claims.

The Court will begin with the individual-capacity claims against Vantell and Rodela. It does so because the official-capacity claims, the supervisory liability claims against the officers, and the Monell claim against CoreCivic all require an underlying constitutional violation. See Lowrance v. CoreCivic, Inc., 2026 WL 700444, at *4 (6th Cir. Mar. 12, 2026) (finding that Monell claim against CoreCivic failed without an underlying constitutional violation); Cook v. CoreCivic, Inc., 2025 WL 967544, at *8 (M.D. Tenn. Mar. 31, 2025) (finding that supervisory liability claims against Hininger, Swindle, and Medlin failed without an underlying constitutional violation). As explained below, Tillery fails to allege a constitutional deliberate indifference claim against Vantell in his individual capacity, but he does state one against Rodela. Because the claim against Rodela is the only underlying constitutional violation, the Court addresses whether it supports the Monell, official-capacity, and supervisory liability claims. It does not. And with the only surviving federal claim being asserted against Rodela, the Court will decline to exercise supplemental jurisdiction over the state-law claims against all other Defendants.

A.    Failure to Protect

The Court begins with the failure-to-protect claims. Tillery asserts this theory against Vantell individually, and he also purports to assert it against CoreCivic. (See Doc. No. 47 at 3). "CoreCivic, however, as a private entity performing a government function," can be held liable under Section 1983 only if it caused the constitutional violation at issue "through execution of its own policies or customs." Massey, 2023 WL 5917399, at *5 (quoting City of Canton v. Harris,

489 U.S. 378, 385 (1989)).  The Court will thus, as an initial matter, focus on whether Tillery states a constitutional claim against Vantell.

The Eighth Amendment bars the infliction of "cruel and unusual punishments."  U.S. Const. amend. VIII.  To state an Eighth Amendment failure-to-protect claim, Tillery "must allege facts plausibly showing two components: one objective, one subjective."  Caraway v. CoreCivic of Tennessee, LLC, 98 F.4th 679, 683 (6th Cir. 2024).  Because the failure-to-protect claims fail under the objective component, the Court need not reach the subjective component.

### 1.      Objective Component

The objective component requires Tillery to plausibly allege that he "faced an objectively excessive risk of harm."  Id. (citing Farmer v. Brennan, 511 U.S. 825, 837 (1994)).  "Even where a serious injury occurs, the objective prong of a failure-to-protect claim requires an analysis of the risk to the injured party before the alleged injury occurred."  Zakora v. Chrisman, 44 F.4th 452, 469 (6th Cir. 2022).  "The relevant constitutional 'injury' is the exposure to an objectively excessive risk, *not* any physical harm that befalls the inmate because of that risk."  Caraway, 98 F.4th at 685.

In Zakora and Caraway, the Sixth Circuit clarified the type of allegations that plausibly state an objectively excessive risk of harm.  Both cases involved allegations that CoreCivic, and its officials, exposed inmates to an unconstitutional risk by allowing drugs to flow freely into the facility.  Zakora, 44 F.4th at 461; Caraway, 98 F.4th at 682.  In Zakora, the plaintiff alleged that two other inmates in his small twelve-to-sixteen person cell block had overdosed two days before the plaintiff's fatal overdose.  44 F.4th at 461.  The back-to-back overdoses, the court found, evidenced an objectively serious risk of harm that others in the unit were also exposed to a high risk of serious health issues stemming from the prevalence of the drugs.  Id. at 472.  In Caraway, on the other hand, the plaintiff alleged only "broad statements about overdoses in CoreCivic

6

facilities," with no indication of "the magnitude of the overdose problem" in the plaintiff's roughly 1500 inmate facility. 98 F.4th at 684-85. Framed at that "level of generality," the court could "only speculate" as to the actual risk exposure. Id. at 685.

This Court has also addressed the type of allegations that plausibly show an objectively excessive risk of harm under Zakora and Caraway. In Estate of Leeper, the plaintiff alleged that inmates at CoreCivic-operated Trousdale Turner Correctional Center were overdosing at a rate of up to twenty per day, that correctional officers were smuggling the drugs into the facility, and that those officers were thwarting attempts to root them out. 797 F. Supp. 3d at 808. The plaintiff also alleged that prison officials—including the warden—were aware of the risk caused by the drug problem because they engaged in daily radio conversation about the overdoses. Id. On those detailed, facility-specific allegations, the Court found the objective prong satisfied. Id.

Zakora, Caraway, and Estate of Leeper confirm that only "detailed allegations" from which the Court can "reasonably infer" an acute exposure to harm beyond that typical of day-to-day life in prison satisfy the objective prong. Caraway, 98 F.4th at 685; see also Zakora, 44 F.4th at 472; Est. of Leeper, 797 F. Supp. 3d at 808. That threshold reflects the practical reality that prisons are inherently dangerous places. Cf. Farmer, 511 U.S. at 858 (Thomas, J., concurring in the judgment) ("Prisons are necessarily dangerous places; they house society's most antisocial and violent people in close proximity with one another."); Spear v. Sowders, 71 F.3d 626, 630 (6th Cir. 1995) (en banc) ("Prisons are dangerous and filled with law-breaking because that is where the criminals are. Even the most secure prisons are dangerous places for inmates, employees, and visitors.").

Tillery's general allegations about inmate harm due to understaffing do not evidence an excessive risk of harm beyond the inherent dangers of day-to-day life in prison. Caraway, 98 F.4th at 685; Zakora, 44 F.4th at 472. On the first assault, Tillery alleges no facts that he faced an

objectively excessive risk of harm before that assault occurred.  Tillery does not allege that there had been other assaults in his unit before he was attacked.  Nor does he allege that there had been other recent assaults in WCF in general before his attack.  He alleges only that an inmate assaulted him while his unit was unguarded.  (Doc. No. 38 ¶ 11).  And his broader allegations about understaffing at CoreCivic facilities in Oklahoma, Kansas, Mississippi, and elsewhere in Tennessee from 2011 to 2022 are not specific enough to fill the gap.  (Id. ¶¶ 18-30).  Tillery's allegations, at best, tell the Court what happened to him, but not the risk he was exposed to before it happened.  The Court can do little more than speculate as to the actual degree of risk.  Caraway, 98 F.4th at 685.

The second assault presents a closer question because Tillery can point to a specific recent incident.  Weeks before, he had been severely beaten while his unit was left unguarded.  (Doc. No. 38 ¶ 11).  Even so, the first assault does not establish that Tillery faced any greater ongoing risk of harm than he did before the assault.  Consider the alleged risk of harm in Zakora and Estate of Leeper.  Illegal drugs flowing into the plaintiffs' units in those decisions directly exposed the plaintiffs to a risk of harm (overdose death) that was objectively greater than that which they typically faced in their day-to-day lives as inmates.  Zakora, 44 F.4th at 461; Est. of Leeper, 797 F. Supp. 3d at 808.  Unlike those decisions, the facility-wide understaffing here did not expose Tillery to any risk beyond that which he faced in his day-to-day life at WCF.  Was Tillery assaulted because of personal animus?  A gang dispute?  Random violence?  Were the conditions that led to the first attack ongoing?  Why was he "threatened and extorted" upon returning to general population? (Doc. No. 38 ¶ 15).  Were the attacks inevitable?  Prisons are inherently dangerous.  Farmer, 511 U.S. at 858; Spear, 71 F.3d at 630.  Depending on the answers to those questions, Tillery could just as well have been assaulted in a fully staffed, completely guarded unit.  To be

8

sure, the absence of guards may have presented an increased opportunity for an assault to occur when it did and may have contributed to the severity of Tillery's injuries. But the constitutional injury is the exposure to excessive risk, not the injury itself. Caraway, 98 F.4th at 685. Once again, the Court can do little more than speculate as to the degree of Tillery's risk exposure. Id.

In sum, Tillery fails to allege that he was exposed to an objectively excessive risk of harm to support his failure-to-protect theory against Vantell in his individual capacity. Because the claim fails under the objective component, the Court need not assess whether Vantell subjectively knew of and disregarded any such risk.

B.      Medical Indifference

The Court next turns to the medical-indifference claims. Tillery asserts this theory against Vantell individually, Rodela individually, and he also purports to assert it against "T. Robinson." (Doc. No. 47 at 5). Because Tillery never served "T. Robinson," the Court does not consider the claims against her.

Prison officials violate the Eighth Amendment if they are "deliberately indifferent" to a prisoner's "serious medical needs." Lowrance v. CoreCivic, Inc., 2026 WL 700444, at *2 (6th Cir. Mar. 12, 2026) (quoting Phillips v. Tangilag, 14 F.4th 524, 532 (6th Cir. 2021)). Like failure-to-protect claims, medical-indifference claims have objective and subjective components. Id. The Court begins with the objective component. "Only if a prisoner proves this objective element must courts consider the second (subjective) part of the deliberate-indifference test." Id. (quoting Phillips, 14 F.4th at 535).

1.      **Objective Component**

The objective component requires Tillery to plausibly allege that his medical need was "sufficiently serious." Id. (quoting Phillips, 14 F.4th at 534). A medical need is sufficiently serious when it "has been diagnosed by a physician as mandating treatment," or the need "is so

9

obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" Jones v. Muskegon Cnty., 625 F.3d 935, 941 (6th Cir. 2010) (citation omitted).

Tillery's allegations establish that his medical need was sufficiently serious. After the first assault, Tillery suffered multiple facial fractures requiring surgery. (Doc. No. 38 ¶ 12). His treating physicians at Elvis Presley Trauma Center diagnosed his injuries and specifically directed an eye clinic visit within two weeks of his discharge. (Id.). Because Tillery's condition required surgery and further treatment by an eye clinic, his medical need was sufficiently serious. Jones, 625 F.3d at 941.

### 2. Subjective Component

The subjective component sets a "high bar." Lowrance, 2026 WL 700444, at *2 (quoting Rhinehart v. Scutt, 894 F.3d 721, 738 (6th Cir. 2018)). Subjectively, the prison official must "know of and disregard the serious medical need." Id. (quoting Phillips, 14 F.4th at 535). "That in turn requires an official to (1) know of the facts that show the serious medical need, (2) personally conclude that this need exists, and then (3) consciously disregard the need." Id. (internal quotation marks and citation omitted). Allegations amounting to negligence or malpractice are not sufficient to satisfy the subjective component. Id. (citing Durham v. Nu'Man, 97 F.3d 862, 868 (6th Cir. 1996)).

#### i. Vantell

Tillery's allegations against Vantell are legally insufficient. Vantell is the warden of WCF. Tillery does not allege that Vantell played any role in treatment decisions at WCF. In fact, Tillery does not allege that Vantell had any personal knowledge or involvement in the events giving rise to his claims whatsoever. Instead, Tillery alleges that he filed grievances about the lack of medical care, and Vantell "ignored" them. (Doc. No. 38 ¶ 17). That allegation is insufficient to establish that Vantell knew the circumstances of Tillery's serious medical need. There are no allegations of

10

when the grievances were filed, who they were filed with, or what they contained.  Even if Vantell

knew of Tillery's medical need, nothing indicates that Vantell concluded that Tillery needed an

eye clinic follow-up and then consciously decided not to send him.  At most, Tillery alleges that

Vantell failed to act on a grievance.  That may well be negligent, but it does not clear the "high

bar" of conscious disregard of Tillery's serious medical need.  Lowrance, 2026 WL 700444, at *2

(quoting Rhinehart, 894 F.3d at 738).  Tillery's medical-indifference claim thus fails against

Vantell in his individual capacity.

ii.  Rodela

Tillery's allegations against Rodela present a closer case because she actually saw and

presumably treated him.  As Tillery's treating physician at WCF, Rodela supervised Robinson,

and was "familiar with the circumstances of his case."  (Doc. No. 38 ¶ 14).  Tillery also repeatedly

complained about headaches and blurred vision to Robinson, who periodically checked in on him

under Rodela's supervision.  (Id. ¶ 13).  Those allegations are sufficient to infer that Rodela was

aware of the first assault, including the medical treatment to his head that required surgery, and

she was aware of the directive for an eye clinic follow-up and Tillery's complaints of headaches

and blurred vision.  They are also sufficient to infer that Rodela knew that Tillery had a serious

medical need.

Tillery's allegations also establish that Rodela consciously disregarded his medical need.

In Lowrance, the Sixth Circuit recently clarified the type of allegations necessary to establish

conscious disregard in a medical-indifference claim.  2026 WL 700444, at *2-3.  In that decision,

a prison facility nurse reviewed an inmate's file at intake, which indicated that he needed an outside

dental visit.  Id. at *1.  The nurse confirmed that the inmate "would be scheduled" for the dental

treatment, but she "failed to appropriately refer him" to dental.  Id.  Seven months later, the inmate

died from sepsis "[as] a result of the untreated dental injuries."  Id.  The court held that those

11

allegations did not amount to conscious disregard because there were no facts suggesting that the nurse "disregarded a known or obvious consequence of her actions in failing to refer him." Id. at *2 (cleaned up) (quoting Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown, 520 U.S. 397, 410 (1997)). In other words, the nurse had no knowledge or notice that her failure to schedule the dental visit would result in sepsis.

Lowrance confirms that simply failing to send an inmate for outside treatment, even when there is a referral for that treatment, is not conscious disregard. The deliberate choice not to send an inmate for recommended treatment crosses into conscious disregard only when that choice is likely to result in some obvious serious harm to the inmate that the defendant recognized and ignored. If it is not obvious that the inmate will be harmed without the outside treatment, the failure to send him "may support a claim for professional negligence," but not "deliberate indifference." Id. at *3 (quoting Reilly v. Vadlamudi, 680 F.3d 617, 625 (6th Cir. 2012)). So even if Rodela knew that she could not provide Tillery with the same level of care as the eye clinic could provide and chose not to send him anyway, the question remains whether it was known or obvious that Tillery would continue to suffer from the vision issue and headaches.

The Court finds that it was. Tillery's claim stands on much stronger footing than that in Lowrance. In Lowrance, the connection between a missed dental visit and the inmate's eventual death from sepsis was far from obvious. Few would assume that failing to send someone to a dentist would be fatal. On the other hand, the hospital here specifically directed an eye clinic follow-up. Tillery continuously complained of headaches and blurred vision. Given the trauma to Tillery's head requiring surgery, it would seem obvious, then, that Tillery would continue to suffer from headaches and blurred vision if he was never sent to the eye clinic.

Tillery's case is further distinguishable from Lowrance because the nurse there promised the inmate that they would be scheduled for the prescribed visit, but then let it fall through the cracks. Id. at *1. Tillery alleges here, however, that Rodela completely "ignored his complaints" about "headaches and blurred vision." (Doc. No. 38 ¶ 13). He also alleges that Rodela "failed to send him for an eye evaluation as directed by the hospital," "failed to transfer him to a facility that was capable of treating his injuries," and completely ignored "grievances about the lack of medical care." (Id. ¶¶ 14, 17).

Those allegations when construed most favorably to Tillery are sufficient to plausibly allege that Rodela consciously disregarded a known or obvious consequence of her inaction. Tillery's medical-indifference claim thus survives as to Rodela in her individual capacity.

C.     Remaining § 1983 Claims

The Monell claim against the CoreCivic entities, the official-capacity claims against Vantell and Rodela, and the supervisory liability claims against Hininger, Swindle, and Medlin all require an underlying constitutional violation. Lowrance, 2026 WL 700444, at *4 (holding that "[w]ithout an underlying unconstitutional act," plaintiff's claims against CoreCivic "under § 1983 must also fail" (quoting Baynes v. Cleland, 799 F.3d 600, 622 (6th Cir. 2015))); Caraway, 98 F.4th at 687 ("[B]ecause the complaint doesn't allege an underlying constitutional violation, [the Monell] claims fail."); Cook, 2025 WL 967544, at *5, *8 (dismissing supervisory liability claims against Hininger, Swindle, and Medlin and Monell claim against CoreCivic for the same reason).

The failure-to-protect claims against Vantell fail, so the only remaining underlying unconstitutional act is Rodela's alleged medical indifference. The Court will address whether that alleged unconstitutional act supports Tillery's Monell, official-capacity claims, and supervisory liability claims in turn.

13

### 1.    Monell and Official Capacity claims

CoreCivic can be held liable under Section 1983 "only if its policies, practices, or customs were the driving or moving force" behind the constitutional violation at issue. Est. of Leeper, 797 F. Supp. 3d at 811 (citing Harris, 489 U.S. at 385). The official-capacity claims against Vantell and Rodela are analyzed under the same framework, because "individuals sued in their official capacities stand in the shoes of the entity they represent." Massey, 2023 WL 5917399, at *5 (quoting Alkire v. Irving, 330 F.3d 802, 810 (6th Cir. 2003)). The inquiry is two-pronged: (1) whether Tillery has alleged the deprivation of a constitutional right, and (2) whether CoreCivic's official policy or custom is responsible for that deprivation. Est. of Leeper, 797 F. Supp. 3d at 811 (citing Cash v. Hamilton Cnty. Dep't. of Adult Probation, 388 F.3d 539, 542 (6th Cir. 2004)).

The first prong is satisfied because Tillery sufficiently alleged that Rodela deprived him of his constitutional right through indifference to his medical needs. The question then is whether CoreCivic had an official policy or custom responsible for that deprivation. To allege an illegal policy or custom, Tillery must assert sufficient facts to establish "(1) an illegal official policy or legislative enactment; (2) an official with final decision-making authority ratified an employee's illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." Id. (citing Burgess v. Fischer, 735 F.3d 462, 478 (6th Cir. 2013)).

Tillery has not alleged a policy or custom responsible for his constitutional deprivation. Tillery alleges that CoreCivic has "adopted a policy of withholding medical care from inmates in order to maximize profits." (Doc. No. 38 ¶ 31). That legal conclusion is accompanied only by broad allegations about inadequate medical care at CoreCivic facilities in Idaho, Oklahoma, Kansas, Mississippi, and elsewhere in Tennessee. (Id. ¶¶ 18-30). To be sure, those allegations are alarming. But there are no allegations from which the Court can conclude that Rodela's decision

not to send Tillery to the eye clinic was a result of any policy at WCF. The <u>Monell</u> claim against CoreCivic and the official-capacity claims against Vantell and Rodela thus fail.

### 2. Supervisory Liability Claims

Tillery argues that Hininger, Swindle, and Medlin are liable for "civil rights violations" based on their "knowing acquiesc[ence]" in the unconstitutional conduct of their subordinates. (Doc. No. 47 at 5-6). A failure to supervise "must be based on more than *respondeat superior*, or the right to control employees." <u>Est. of Leeper</u>, 797 F. Supp. 3d at 812 (quoting <u>Shehee v. Luttrell</u>, 199 F.3d 295, 300 (6th Cir. 1999)). A simple failure to act will not suffice without "a showing of 'direct responsibility' for the actions of the individual officers." <u>Id.</u> (quoting <u>Hays v. Jefferson Cnty.</u>, 668 F.2d 869, 873-74 (6th Cir. 1982)). Rather, "supervisory liability requires some 'active unconstitutional behavior' on the part of the supervisor." <u>Id.</u> (quoting <u>Peatross v. City of Memphis</u>, 818 F.3d 233, 241 (6th Cir. 2016)).

Tillery's allegations fall well short of that standard. Tillery does not allege that Hininger, Swindle, or Medlin had any supervisory role over officials at WCF, let alone over Rodela's medical decisions. The supervisory liability claims thus fail.

### D. State Medical Malpractice and Negligence Claims

Defendants' sole argument that Tillery's state claims should be dismissed is that the Court should decline supplemental jurisdiction over them after dismissing all federal claims. (Doc. No. 44 at 25). Because the claim against Rodela in her individual capacity survives, the Court will continue to exercise supplemental jurisdiction over the state claims as to Rodela. As to the remaining Defendants, whose federal claims have been dismissed in their entirety, the Court declines to exercise supplemental jurisdiction over the state claims against them. See <u>Royal Canin U. S. A., Inc. v. Wullschleger</u>, 604 U.S. 22, 31-32 (2025) (explaining that a district court "may

(and indeed, ordinarily should) kick the case to state court" where the district court "has dismissed all claims over which it has original jurisdiction" (quoting 28 U.S.C. § 1367(c))).

## IV. CONCLUSION

For the reasons set forth above, the motion to dismiss (Doc. No. 43) will be granted in part and denied in part.

An appropriate order will enter.

IT IS SO ORDERED.

WAVERLY D. CRENSHAW, JR.
UNITED STATES DISTRICT JUDGE